**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**JUSTIN ADAMS**

No:

*Plaintiff*

v.

*ELECTRONICALLY FILED*

**THE CITY OF GREENSBURG, THE
GREENSBURG POLICE DEPARTMENT,
SERGEANT JASON GAIN (in his official
capacity and as an individual),
PATROLMAN JASON DEITER (in his
official capacity and as an individual),
GREENSBURG POLICE CAPTAIN
ROBERT STAFFORD (in his official
capacity and as an individual), MAYOR OF
GREENSBURG and PRESIDENT OF
GREENSBURG CITY COUNCIL ROBERT
BELL (in his official capacity and as an
individual), GREENSBURG CHIEF OF
POLICE CHAD ZUCCO (in his official
capacity and as an individual), jointly and
severally,**

**JURY TRIAL DEMANDED**

*Defendant*s

## INTRODUCTION

This action arises under the Fourth, Fifth, Ninth, and Fourteenth Amendments to the United

States Constitution; under federal law, specifically, Title 42 U.S.C. §§ 1983, 1985, 1986 and 1988,

42 U.S.C §1981, Civil Rights Act of 1866, Civil Rights Act of 1964 (TITLE VII) ; and under

Pennsylvania law for Discrimination under the Pennsylvania Human Relations Act ("PHRA"),

Discrimination, Hostile Work Environment and Intentional Infliction of Emotional Distress.

While the Defendants were acting within the scope of their elected, and/or appointed offices and employment and under color of state law, they intentionally violated the due process rights of the Plaintiff, along with various torts of the Commonwealth of Pennsylvania. The intentional unlawful actions of the Defendants caused injury to the Plaintiff without due process of law.

This action is also brought against the Defendants for their failure to properly train and supervise the individual Defendants, uphold and honor contracts negotiated and approved, and failure to prevent constitutional and state law violations against the Plaintiff. The Defendants were the actors, and/or final policy makers, and instigated, enabled, and/or did nothing to prevent the financial and severe emotional damages suffered by the Plaintiff.

## JURISDICTION AND VENUE

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331, 1343, and 1367. Venue is properly set in the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. 1391.

The following causes of action alleged arise from myriad of injuries to the Plaintiffs occurring in this judicial district, Pittsburgh Division, Allegheny County. The named Defendants all have their nexus in this judicial district.

## PARTIES

1.      Plaintiff Justin Adams, also referred to as Officer Adams, "Adams," is a citizen of the United States of America, residing at 4 Cree Drive Greensburg, PA 15601.

2.      Defendant the City of Greensburg, incorporated in 1926, is a Home Rule Municipality governed by a Charter passed by the voters in 1988, with a business mailing address of 416 South Main Street Greensburg, PA 15601.

3.      Defendant Greensburg Police Chief Chad Zucco with a business mailing address of 416 South Main Street Greensburg, PA 15601.

4.      Defendant Patrolman Jason Deiter with a business mailing address of 416 South Main Street Greensburg, PA 15601.

5.      Defendant Sergeant Jason Gain with a business mailing address of 416 South Main Street Greensburg, PA 15601.

6.      Defendant Robert L. Bell is the Mayor of the City of Greensburg and serves as President of Greensburg City Council, with a business mailing address of 416 South Main Street Greensburg, PA 15601.

7.      Defendant Captain Robert Stafford with a business mailing address of 416 South Main Street Greensburg, PA 15601.

## BACKGROUND FACTS

8.      Plaintiff is a (26) year old African American male.

9.      Plaintiff has been an accredited police officer since January of 2013.

10.     Plaintiff has never been reprimanded, suspended, or written up as a police officer.

11.     Plaintiff has had a spotless employment record at every police department Plaintiff has been employed.

12.     Plaintiff's prior and current police employers can testify to Plaintiffs strong positive work ethic.

13.     On June 21, 2015 Plaintiff was hired by Greensburg Police Department as a full time police officer.

14.     On or about June 28, 2015 Plaintiff was provided a Greensburg Police Department Standard Operating Procedure "SOP" manual.

15.     Plaintiff was hired through the civil service process and was selected by order.

16.     It was rumored that Greensburg Police Department did not want to hire Plaintiff because of his race, but had to because of the Civil Service rules.

17.     Plaintiff was immediately sent undercover to African American beer gardens and told to "buy drugs."

18.     Plaintiff was ordered to identify African American suspects for other police officers.

19.     Patrolman Deiter stated that Plaintiff was good at identifying "them" (African American suspects) because "they all look the same."

20.     During this period of "under cover" work Plaintiff continuously experienced similar comments specifically relating to his skin color being black.

21.     One of the comments directed to Plaintiff was..."There was one black guy here prior to you for a reason."

22.     Another comment directed to Plaintiff was..."You know that you can't talk like "them" while in uniform."

23.     Plaintiff begun to feel very uncomfortable and increasingly alarmed by the racially hostile statements directed toward him.

24.     After roughly a five week period, Plaintiff was placed in uniform and assigned a Field Training Officer "FTO."

25.     Plaintiff's first FTO was Sergeant Cole.

26.     Plaintiff worked under Sergeant Cole for two weeks.

27.     Plaintiff enjoyed the time with Sergeant Cole, and Sergeant Cole's reports stated that Plaintiff was very good at writing reports.

28.     Sergeant Cole's FTO status on the 11 to 7 shift lasted approximately two weeks.

29.     As required by the Standard Operating Procedure Manual (SOP), Sergeant Cole was to write a report on Plaintiff's performance and keep daily logs of their shift activities to be signed off by both Plaintiff and FTO;

30.     The final report by Sergeant Cole stated that Plaintiff understood the basics of being a police officer and will eventually learn the city roads.

31.     The daily reports reflected good performance from Plaintiff, but that he needed minimal improvements to his knowledge of roads in the area to that was to be patrolled.

32.     At no time did Sergeant Cole express any disciplinary or performance issues that would prevent Plaintiff from being an effective policeman and continue his employment at the police department.

33.     According to the SOP, Plaintiff was to train with Sergeant Cole for a period of one month.

34.     The FTO training period with Cole only lasted two weeks.

35.     After Sergeant Cole, Plaintiff received FTO Joshua Shapiro.

36.     Plaintiff was assigned to FTO Shapiro for around two weeks.

37.     In FTO Shapiro's final report, Plaintiff was given a report that stated positive progress.

38.     FTO Shapiro's daily reports also expressed similar positive ratings.

39.     FTO Shapiro's shift with Plaintiff was 3 to 11.

40.     FTO Shapiro was terminated for fraudulently manipulating record books for his DOT

certification.

41.    Sergean Jason Gain became Plaintiff's next FTO.

42.    FTO Sergeant Gain was only assigned to Plaintiff for approximately two weeks, but continued the 3 to 11 shift with Plaintiff.

43.    FTO Sergeant Gain gave Plaintiff a very good report at the end of Plaintiff's FTO period.

44.    FTO Sergeant Gain also gave Plaintiff very good daily reports.

45.    Patrolman Denning became Plaintiff's last and final FTO on the 11 to 7 shift that lasted approximately six weeks.

46.    FTO Denning provided Plaintiff with outstanding daily reports, and also provided Plaintiff with a very good end of FTO report.

47.    FTO Denning also showed Plaintiff a parking spot behind the welfare office, where Plaintiff could park in order to work on reports, and or "take time to yourself," so long as Plaintiff's work was completed.

48.    After FTO Denning's training period, Plaintiff began patrolling on his own.

49.    Sergeant Gain was the only FTO that would publicly make reference to Plaintiff's racial status as an African American.

50.    Sergeant Gain's continuously pervasive remarks about Plaintiff being black, made Plaintiff feel increasingly uncomfortable and threatened.

51.    Sergeant Gain would make derogatory remarks about African Americans in front of Plaintiff's superiors.

52.    Plaintiff felt that he had no recourse in preventing future racially derogatory remarks from Sergeant Gain.

53.     Plaintiff would avoid Sergeant Gain at every possible opportunity.

54.     The SOP clearly states that any official reprimand requires signature, a copy in triplicate, and put into the employee's employment file (Chapter 5 of SOP).

55.     The SOP states that Chief of Police shall immediately notify the accused (Chapter5 of SOP) of any reprimands.

56.     Plaintiff was never reprimanded for any disciplinary action.

57.     The SOP's disciplinary guidelines are for all officers, and does not discriminate between officers that are on probation and officers that are not on probation.

58.     The SOP states that the employee officer shall get a progress report in the form of performance evaluations every month, and the officer must sign each and every one.

59.     SOP also states that if a "marginal" rating is expected, written notice of intent to discharge or suspend must be served on the employee "not more than 15 and not less than 10 days prior to the last day of the probationary period."

60.     Plaintiff only received four performance evaluations and all evaluations fell within the average performance of every other officer.

61.     At a firearms training class about mid September 2015, Patrolman Deiter, in front of Lt. Jones, Captain Stafford, and many other policeman,  publicly humiliated Plaintiff by loudly asking ...."you know that we don't hold our gun sideways when we shoot, right?"

62.     This intentionally humiliating racially charged question was made in front of Plaintiff's direct supervisors.

63.     On or about January14, 2016, during an afternoon shift, Plaintiff was confronted by Officer Deiter asking Plaintiff why "his people" could say the " 'N' word?"

64.     Plaintiff could not politely or intelligently react to Officer Deiter's statement, and said nothing.

65.     During an afternoon shift on or about 1 Feb 2016 while standing outside of the Sheetz on Harvey Ave, Plaintiff was talking with Patrolman Scalzo and Sergeant Gain. Plaintiff made a statement about how more blacks should join the police force in efforts to be part of a successful future community solution.

66.     Sergeant Gain stated, " They could if they weren't so busy doing drugs, and getting arrested, ...most of 'them' have criminal records."

67.     On or about February 6, 2016, Sergeant Gain, Patrolman Macatee, Patrolman Dieter were discussing a shooting that recently happened in Allegheny County involving a black subject. The officers looked at Plaintiff and stated that " if a black guy needs shot here, our guy (*i.e.*, the Plaintiff) is going to have to do it so we don't make the news!"

68.     Plaintiff was becoming more frequently isolated because of the color of his skin.

69.     Plaintiff could no longer comfortably be in the presence of Officer Dieter and Sergeant Gain without experiencing a great deal of emotional stress.

70.     Plaintiff's work performance begun to suffer because of the isolation and verbal and emotional harassment based on his skin color.

71.     On or about 9 April 2016 Plaintiff arrived at the station playing "hip hop" style music at a moderate and acceptable noise level. Plaintiff parked directly to the left of Patrolman Dieter who was sitting in his personal car playing  "country" style music, also at a moderate noise level. Plaintiff and Patrolman Dieter both got out of their vehicles and began walking towards the entrance of the police station when Patrolman Dieter stated "It's embarrassing to us when

you play that kind of 'stuff' when coming to work. You're a cop, you should know better, it makes us all look bad."

72.     Plaintiff asked if he should change his music from hip hop to country; Patrolman Dieter replied "that would be an improvement."

73.     Plaintiff felt that he could no longer enjoy or comfortably listen to music of his choice.

74.     During an afternoon shift, spaghetti and meatballs had been provided to the officers in the break room for dinner.

75.     As officers gathered to eat, Plaintiff was publicly humiliated by patrolman Dieter when Dieter loudly stated to Plaintiff, "I bet you are disappointed that it is not fried chicken!"

76.     The entire room began to laugh at Plaintiff.

77.     Plaintiff was humiliated to the point that he could no longer eat, and left in order to avoid further racial harassment and emotional distress.

78.     Plaintiff could not comfortably work with these officers and felt that his superior officers condoned the racial abuses that were perpetrated against the Plaintiff.

79.     At various times Plaintiff quietly requested from his superiors relief from the increasingly frequent racial harassment and emotional distress he was experiencing.

80.     April 27, 2016, Plaintiff was escorted into the Chief of Police office.

81.     In the chief's office was  Lt. Jones, Captain Stafford, and Chief Zucco.

82.     Chief Zucco stated that Plaintiff was not going to make it off probation and that Plaintiff was terminated immediately.

83.     Chief Zucco stated that his decision cannot be appealed and that the department did not have to follow the disciplinary procedure (as required by the SOP) because Plaintiff was on

probation.

84.     On April 28, 2016, Plaintiff met with Patrolman Scalzo to return the remainder of Greensburg Police Department property in Plaintiff's possession.

85.     At that time, Patrolman Scalzo provided Plaintiff with a police department letter that listed nine reasons why Plaintiff was terminated.

86.     Not for any of the nine alleged reasons for Plaintiff's termination had Plaintiff ever been written up or reprimanded as required by the SOP.

87.     Plaintiff's pleas to Plaintiff's superiors for relief from racial harassment and emotional distress had fallen on deaf ears and eventually ended in Plaintiff's termination.

88.     Plaintiff requested and was summarily denied an audience with the Mayor of Greensburg in order to report the racial harassment.


## COUNT I

**JUSTIN ADAMS vs. CITY OF GREENSBURG, AND ALL DEFENDANTS; DUE PROCESS,14th AMENDMENT, 4th AMENDMENT, §§ 1983, 1985, AND 1986,CIVIL RIGHTS ACT OF 1866,CIVIL RIGHTS ACT OF 1964 (TITLE VII), DISCRIMINATION UNDER THE PENNSYLVANIA HUMAN RELATIONS ACT ("PHRA") and  42 U.S.C §1981**

89.     The previous paragraphs are incorporated by reference as if set forth at length herein.

90.     Plaintiff endured a constant, severe, pervasive and continuously increasing racial harassment creating a hostile work environment.

91.     Plaintiff was subject to severe, pervasive and constant harassment by Patrolmen Jason Deiter through racial comments such as, "liking fried chicken" over the other food offered to Plaintiff in public settings, harassing Plaintiff over his music, stating that "your rap music makes

us all look bad;" forcing Plaintiff to talk about the word "nigger;" and publicly humiliating Plaintiff in front of supervisors and other officers during a live fire exercise by loudly stating "you know that we don't hold our gun sideways while we shoot, right?"

92.     These unnecessary and intentionally insulting racial statements were severe and pervasive and directed towards Plaintiff and were not only isolated to Patrolman Deiter behavior.

93.     Sergeant Jason Gain also made numerous racially insulting statements towards Plaintiff, publically in front of other officers and in private.

94.     At the Sheets gas station, Gain informed Plaintiff that most "blacks" could not become policeman because "they have criminal records and are too busy doing drugs."

95.     Gains racial harassment was exhibited in the police department lunchroom, criticizing Plaintiff's innocent dislike for spaghetti by intentionally drawing upon a racial stereotype by stating, "if it was fried chicken, you would not be disappointed."

96.     Patrolman Regina Macatee, after discussing a television news story describing a shooting involving a black male, stated to Plaintiff in the presence of other officers, ...."if a black man needs a' killing, you are going to have to do it!"

97.     This statement was made to humiliate and isolate and infer that Plaintiff would have to commit black on black violence so the Greensburg Police Department did not "make the news."

98.     During these public racially charged remarks Plaintiff's supervisors were present and failed to take any action whatsoever.

99.     Since Plaintiff was the only African American employee at the police department, he felt that every racially motivated statement was intentionally directed to belittle and humiliate him.

100.    The total lack of action from Plaintiff's supervisors caused his work environment to be hostile and intolerable.

101.    Plaintiff was so harassed and feared humiliation that he would miss hearings at court in order to avoid certain officers that would publically embarrass him.

102.    Plaintiff would talk on the phone to his friends and family members in an attempt to calm himself down before, during, and after contact with the officers who made severe and pervasive harassing racial statements directed to Plaintiff.

103.    Plaintiff could not effectively perform his duties as a policeman because his primary focus was to survive the day at work while his co-workers constantly made racially charged comments denigrating his racial background.

104.    Plaintiff has a constitutionally protected right to work without being racially insulted by co-workers.

105.    Plaintiff was told by his co-workers that his race is composed of drug users and addicts and generally are a group of criminals, and many other intentionally insulting, humiliating  and hostile statements and racial accusations.

106.    Plaintiff's supervisors had a duty to act in preventing such racially motivated verbal attacks on Plaintiff, especially when they were physically present when some of the racially hostile statements and comments were directed towards Plaintiff.

107.    Each and every Defendant supervisor could have stopped the racial hostilities directed toward Plaintiff, but failed to do so.

108.    The Defendant supervisor's, including the mayor, chose to allow the racially hostile activity to continue, even participating by laughing or simply watching the racially hostile

environment grow.

109.    If not for the Defendants creating and nurturing a severe and pervasive racially hostile work environment, Plaintiff would not have been terminated, thus creating a "constructive" property interest in Plaintiff's job.

110.    Plaintiff was not afforded due process in his probation period, as all evaluations were within the normal range of performance up to the time Plaintiff was notified that he was terminated effective immediately.

111.    It is averred that Plaintiff's race played an important role in Plaintiff's ostracization, mistreatment, and last alleged poor job evaluation, that lead to Plaintiff's unlawful termination.

112.    It is averred that Defendants purposefully created a racially hostile environment that destabilized Plaintiff's performance, intending that Plaintiff would choose to leave voluntarily or create grounds to terminate Plaintiff within the probation period without cause.

113.    It is averred that Plaintiff's race was the main reason for Plaintiff's termination, being that Plaintiff could not be legally terminated through the civil service process.

114.    Being that the several Defendants acted in concert, by building upon the hostile racist comments and that city and police department supervisors also participated in, encouraged or enjoyed the results of the hostile and humiliating racist remarks directed towards the Plaintiff, a constructive conspiracy was present between all Defendants.

115.    All Defendants knew that their Co-Defendants' statements, actions and behavior were racially hostile in nature, yet they chose to either do nothing, laughed, implicitly condoned, or joined in with their co-conspirators unlawful behavior.

116.    Because Plaintiff was terminated unlawfully, Plaintiff's job was seized by Defendants.

117.    It is averred that Defendants committed these unlawful racial attacks because Plaintiff did not fit into the all white Greensburg Police Department.

118.    The Defendants unlawful racial actions and termination have jeopardize Plaintiff's future employment prospects.

WHEREFORE, Plaintiff seeks judgement in Count I against all Defendants, jointly and severally, and for:

a.      Equitable relief reinstating Plaintiff with full back pay and benefits;

b.      Compensation for non-economic damages;

c.       Plus interest, attorney fees, and costs pursuant to 42 U.S.C. 1988;

d.      Punitive damages, and,

e.      Other such relief as this court deems appropriate.  Jury Trial Demanded.

### COUNT II

**JUSTIN ADAMS vs. CITY OF GREENSBURG, AND ALL DEFENDANTS;
WRONGFUL DISCHARGE: VIOLATION OF PUBLIC POLICY**

119.    The previous paragraphs are incorporated by reference as if set forth at length herein.

120.    Plaintiff was within his probationary period at Greensburg Police Department

121.    Plaintiff was dismissed from his position as a police officer for performance issues throughout his tenure that was only made available to Plaintiff at the time of termination.

122.    It has been public policy within the United States of America, the State Governments, and municipal governments of Pennsylvania, that discrimination against race, is prohibited.

123.    There is a clear mandate that racial discrimination in the workplace regarding an employee's race is prohibited

123.     Plaintiff was subject to severe and pervasive verbal racial remarks by Defendants that caused sever strain on his ability to be employed and work as a policeman in Greensburg.

124.     The termination of the Plaintiff's employment by the Defendants was not based on a plausible and legitimate reason.

WHEREFORE, Plaintiff seeks judgement in Count II against all Defendants, jointly and severally, and for:

a.        Equitable relief reinstating Plaintiff with full back pay and benefits;

b.        Compensation for non-economic damages;

c.         Plus interest, attorney fees, and costs pursuant to 42 U.S.C. 1988;

d.        Punitive damages, and,

e.        Other such relief as this court deems appropriate.  Jury Trial Demanded.


**COUNT III**

**JUSTIN ADAMS vs. CITY OF GREENSBURG, AND ALL DEFENDANTS, DISCRIMINATION**

125.     The previous paragraphs are incorporated by reference as if set forth at length herein.

126.     Plaintiff is a member of a protected class.

127.     Plaintiff was qualified for the position (police officer ) when he was hired by the Defendants.

128.     Plaintiff suffered an adverse employment action by being fired after be subjected to severe, pervasive and systemic racial discrimination by the Defendants.

129.     Plaintiff' co-workers were not subject to severe, pervasive or systemic verbal racial

discrimination

130.   The Defendants treated nonmembers of the Plaintiff's protected class more favorably.

WHEREFORE, Plaintiff seeks judgement in Count III against all Defendants, jointly and severally, and for:

      a.      Equitable relief reinstating Plaintiff with full back pay and benefits;

      b.      Compensation for non-economic damages;

      c.       Plus interest, attorney fees, and costs pursuant to 42 U.S.C. 1988;

      d.      Punitive damages, and,

      e.      Other such relief as this court deems appropriate.  Jury Trial Demanded.

### COUNT IV

### JUSTIN ADAMS vs. CITY OF GREENSBURG, AND ALL DEFENDANTS, HOSTILE WORK ENVIRONMENT

131.   The previous paragraphs are incorporated by reference as if set forth at length herein.

132.   Plaintiff is a member of a protected class and he suffered intentional, severe, pervasive and systemic racial discrimination by the Defendants because of his race.

133.   The Defendant's racial harassment detrimentally affected Plaintiff so that he suffered public humiliation, embarrassment, severe emotional distress and loss of employment.

134.   The Defendants racial harassment was outrageous and would detrimentally affect a reasonable person of the same protected class.

135.   The racial discrimination and harassment suffered by Plaintiff was intentional, severe, pervasive and systemic so that Defendants created an abusive working environment.

136.   The Defendants that racially harassing the Plaintiff were supervisory employees or agents of the Defendants, therefore respondeat superior liability existed.

WHEREFORE, Plaintiff seeks judgement in Count IV against all Defendants, jointly and severally, and for:

a.      Equitable relief reinstating Plaintiff with full back pay and benefits;

b.      Compensation for non-economic damages;

c.       Plus interest, attorney fees, and costs pursuant to 42 U.S.C. 1988;

d.      Punitive damages, and,

e.      Other such relief as this court deems appropriate.  Jury Trial Demanded.


## COUNT V

### JUSTIN ADAMS vs. CITY OF GREENSBURG, AND ALL DEFENDANTS; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

137.    The previous paragraphs are incorporated by reference as if set forth at length herein.

138.    The racial discrimination and harassment suffered by Plaintiff because of the Defendants actions were intentional, severe, pervasive and systemic.

139.    The Defendants racial harassment was outrageous and would detrimentally affect a reasonable person of the same protected class.

140.    The Plaintiff suffered severe emotional distress.

141.    Because of the actions of all the Defendants, the Plaintiff was depressed, listless and fearful of leaving his house.

142.    The Plaintiff was afraid to go out in public for fear of seeing one of the Defendants.

143.    The Plaintiff suffered loss of sleep, loss of enjoyment of life, paralyzing feelings of helplessness, fear of the future, and the emotional distress from financial worries from  losing his job.

144.   The Plaintiff's severe emotional distress was the direct result of the Defendants' unlawful and outrageous racial discrimination, and he suffered public humiliation, embarrassment, severe emotional distress and loss of employment, and the financial and emotional distress following such an unlawful termination.

WHEREFORE, Plaintiff seeks judgement in Count V against all Defendants, jointly and severally, and for:

a.   Equitable relief reinstating Plaintiff with full back pay and benefits;

b.   Compensation for non-economic damages;

c.    Plus interest, attorney fees, and costs pursuant to 42 U.S.C. 1988;

d.   Punitive damages, and,

e.   Other such relief as this court deems appropriate.  Jury Trial Demanded.


Respectfully Submitted,

s/ Lawrence E. Bolind, Jr.
Lawrence E Bolind, Jr., Esquire
PA ID No. 44827
238 Main Street
Imperial, PA 15126-1021
(724) 695-8620
(724) 695-8621 (fax)
bolindlaw@verizon.net